Happy everyone made it here on time. The first case this morning is 171714 In Re Burgos. Ready? Please proceed. May it please the court, my name is Mark Pohl here representing the patent applicants Burgos. I'm here not so much to argue the case as to answer questions from you. My client found that a blue pigment in berries, if you extract it and give it to a person that has diabetes, they can eat this pigment before they have a meal and their blood sugar will be stabilized so they don't need to have insulin. So this case feels a lot like Funk Brothers, as I'm sure you realize. Yes. So maybe you could direct our attention to what you think is the strongest argument as to why Funk Brothers does not control. In Funk Brothers, the Supreme Court invalidated about half of the claims at issue and left valid the remaining half. But were all the claims actually in front of the Supreme Court? My understanding was the only claims that were in front of the Supreme Court were the claims that the Supreme Court affirmed the invalidation of. Correct. Okay. And Funk Brothers found that in Funk Brothers there were bacteria, naturally occurring bacteria, and what the patentee had done is they had accumulated different species of bacteria, co-packaged them together, but the co-packaging together, the resulting product, didn't have any different function than the naturally occurring bacteria themselves. You can have bacteria A, B, and C and you put them all together in a bag. Bacteria A functions no differently in the bag than bacteria A functioned in the ground. And so there the Supreme Court said if all you're doing is getting bacteria A, B, and C and packaging them together in a bag, it really seems to be more of an innovation in packaging rather than providing a new functional utility. Here we actually have something different. Here we have these dyes that naturally occurring do not stabilize blood sugar, because naturally occurring they are with five times their weight or more of sugar. And so a person taking the naturally occurring pigment in the naturally occurring state, which would be eating fresh fruit, that would actually precipitate hyperglycemia rather than prevent it. By extracting the dyes and providing them in a purified form, our inventors have found a new utility for these dyes. But the problem is for the breast cancer gene in the human body, the Myriad case was much the same. When the breast cancer gene is in the human body itself, you can't use it as a marker. It's only when you extract it and purify it and then test it can you find out it's in fact a marker for breast cancer. Exactly. But when you say exactly, that's not good for you, right? Because the Supreme Court held those claims were not eligible. The Supreme Court held, the Supreme Court affirmed this court. This court found that the claims to purified cDNA where you take the… I wish you wouldn't call it purified cDNA, because I mean I understand your conception of usage of purified there, but it wasn't, I mean it was the gDNA, the genomic DNA that was isolated from the rest of the DNA and then extracted. The cDNA was something that was engineered in a laboratory somewhere, removing the introns of course, but that is a series of nucleotides that doesn't exist in nature like the isolated genomic DNA. So just for my purposes, if you wouldn't refer to the cDNA as something that's purified from the natural source, I'd appreciate that. Okay. Would we want to call it a DNA from which the introns have been removed? Well cDNA is not found in nature. Your extract is found in nature. The rest of the DNA in myriad was found in nature and that was found to be ineligible. So I don't see how you're like cDNA as opposed to like the rest of the DNA that was in myriad found to be ineligible. Because we're not claiming the compounds in the abstract. We're not claiming a specific pigment in the abstract, which actually which claim could read on the wild naturally occurring pigment. We're claiming an extract that has at least 35% by weight of these pigments. And that kind of a composition, 35% by weight or more, doesn't exist anywhere in nature. Right. But I guess for the myriad case, going back to isolated genomic DNA nucleotide sequence, it doesn't exist in nature in an isolated form. So if you had, once you isolate it and then mix it with, I don't know, 20,000 other DNA sequences just like that one that you isolated, you haven't really achieved anything in the Supreme Court size. So I guess that's the concern. My own feeling with myriad is that the Supreme Court made a very insightful distinction, but they weren't necessarily clear in articulating it. We'd known for years and years that there was a gene correlated with breast cancer risk. We've known for years and years that that gene was somewhere on chromosome 17. Myriad found it. They found the location of it on chromosome 17. And the Supreme Court, in invalidating their claims to the gene, the Supreme Court was, I think, thinking, you're not really patenting the gene, you're patenting the knowledge of where it is, kind of like patenting the location of a town on a map. That's knowledge in the abstract. And we can't let you guys at Myriad co-opt the abstract knowledge of where on chromosome 17 this gene happens to begin and end, because it'll stop all the scientific research in that area. That said, the Supreme Court said the commercial embodiment of that, the test kits and whatnot, the cDNA, that was all found patentable. If I were to take an orange, cut it open, and then squeeze all the juice out of it into a glass so that I had four ounces of orange juice, and I've isolated the juice from the orange so that I don't have to go through all the trouble of eating the entire orange, including the peel around it, have I created a patent-eligible composition of matter in that glass with the juice? Does the juice have a function different than the... It increases my vitamin C levels. Does the orange fruit itself, when you peel the orange and just eat the fruit, does that have the same function? It increases your vitamin C level. Okay, so that's a convenient rule of thumb. If the orange fruit, peeling the orange and eating the orange fruit, or alternatively squeezing the orange juice, if the orange fruit and the orange juice, if you eat them and you have the same function provided by both, then no, that's not patentable. All right, so you're saying squeezing the juice into a glass isn't good enough. Correct. What about if I squeeze in a bunch of grapefruit juice into that same glass? And so now I have a mix of orange juice and grapefruit juice. And I can say, well, I've increased my vitamin C level that much more because I've added grapefruit juice to the orange juice. To the mix. Is that patent-eligible? If eating a grapefruit and an orange fruit provides the same benefit as eating a grapefruit-orange mix, I'm not convinced that the juice would be non-obvious, that it would provide a surprising, counterintuitive, unexpected benefit. So it's not patent-eligible under Section 101? I tend to rely more on 102 and 103. Right, but for purposes of this appeal, I need to think about Section 101. So I'm looking for your thinking on that for Section 101 purposes. For Section 101? I've created a mixture. It doesn't exist in nature, the mixture of grapefruit juice and orange juice. Then, yes, I would say that that is patent-eligible under Section 101. Okay, but why is it, if we know in Funk Brothers that bringing together naturally existing bacteria strains into a mix is not patent-eligible, why would the orange juice and grapefruit juice mix be patent-eligible? Because the bacteria in Funk Brothers are physically in the same bag, but they're not combined with each other. It's as if you took whole oranges and whole grapefruits and put them in a bag. You can get Funk Brothers' sack of bacteria and pull out bacteria A or pull out bacteria B. They're not admixed in a way that combines. Mixing grapefruit and orange juice, you really can't separate the two. I guess here's my problem with your argument. It has an enormous amount of superficial appeal for me. It has an enormous amount of appeal for me, not just superficial, but superficial in light of Myriad and Funk Brothers. And here's why. You seem to disagree with Judge Chen's examples, and I think give a legitimate reason, because your idea is, well, but if these extracts were in the fruit and you ate the fruit, it wouldn't reduce your blood sugar, whereas if you eat just the extract, i.e., the purified or isolated component, it does reduce your blood sugar, right? That's your argument. The problem is, actually, the extract inside the fruit would still act to reduce your blood sugar. It still functions the same way. Nothing changes about its function inside the fruit or outside of the fruit. It's just that when it's in the fruit, the fruit itself has a lot of natural sugar as well, so it kind of cancels each other out. So it isn't that your extract performs differently when purified than it performs in the fruit. It's just the fruit has some natural sugar, which adds to your insulin sugar or whatever you want to call it. So you don't have something that performs differently inside the fruit than it does outside of the fruit, and the Supreme Court was really clear in Myriad. Let me read you a couple of quotes from Myriad. For the reasons that follow, we hold that a naturally occurring DNA segment is a product of nature and not patent-eligible merely because it has been isolated, but that cDNA is patent-eligible because it's not naturally occurring. But then another part, which is even more important, is that Myriad noticed and identified that isolation is necessary to conduct genetic testing, i.e. there's a different function when you can isolate the DNA and conduct genetic testing on it that you couldn't do when it was inside the human body. That wasn't enough to make it eligible. Just like here, there's a different function that can be achieved when you can separate out and get rid of the sugar in the fruit. I just don't see how Myriad hasn't closed the door to your claims. Not that I want it to, but I don't know what to do about these sentences out of Myriad that I'm reading you. The cDNA is, in fact, naturally occurring. No, it's not. It's not. It's not found in nature. The cDNA is not found in nature. This is how genes are expressed. We don't express the introns. We express the exons of a gene. Sue might disagree with you on the science because the Supreme Court did. It expressly said cDNA is patent-eligible because it is not naturally occurring. So whether you think they got that right or wrong or the technology is irrelevant, they've set the standard for the law. I don't know what to do. Can you spend one minute on your examples? Because you have a separate argument that you seem to have not addressed at all about the fact that even if these extracts are found in nature, there's an inventive concept because when combined, they offer unexpected results. Yes. The blue pigments that are naturally found in Chilean wineberry, for example, they have one effect on their own. And the inventors also found that if you take those pigments and you combine them with either a crystalline compound from another kind of plant, that they have a different effect. And if you take these pigments and combine them with yet a third alternatively class of compounds, they have yet another effect. And those combinations of chemicals are not found, to my knowledge, anywhere in nature. You have to actually take several different plants and put them together. I guess this is something that I was curious about in terms of looking at the examples in your specification. Let's just call them natural ingredient number one, natural ingredient number two, and natural ingredient number three. And you're saying that you get a better health benefit when you're combining natural ingredient one with two or one with two and with three. And I'm just curious. It wasn't clear to me that the specification made clear that when you combine all three ingredients, you get a better health benefit than if you were to take the three ingredients individually in series. So instead of taking the three ingredients, mixing them together, and gulping it down in one shot, you first take the first ingredient, then immediately you take the second ingredient, and then you take the third cup and you take the third ingredient. Your specification didn't make clear that you get some kind of synergistic extra plus benefit when you take all three ingredients when mixed together as opposed to taking them individually. Do you understand my question? I understand your question. What is the answer to my question? I don't think temporally it matters if you take them in one pill or if you take them in three different pills, one right after the other. What matters is that these compounds are in your bloodstream at the same time. And to my knowledge, no one has ever tried doing that before. Okay, so let me make sure I understand. You're saying that there's no difference, as you understand it, in whether the three ingredients are mixed together in a single composition versus them being three individual compositions that are then taken in series. Correct. Because all the action is going on inside the body. Exactly. But just to be clear, because I think that something just got left out and not to your advantage, it matters that they're all three in your body at the same time. Right, in your bloodstream. They interact with each other. Whether it's three separate pills or one pill, the presence of all three of them in your body simultaneously has some sort of markedly different characteristics. Exactly, yes. Right? So if you take one pill, wait two days later, take one pill, wait two days later, take one pill, you might have some benefit for you. A small residual. Right? But what you're saying is if all three of these chemicals are in your body at the exact same time, they have a greater reaction than they would have had each individual. Exactly. The concern I have is that there's nothing necessarily beneficial about having all three of them united together in a single composition. It sounds more like maybe there would be an opportunity for a method claim. Take these three natural ingredients. Maybe it doesn't even matter in what order or in the specific timing because they'll all react together inside the system, your human system. But I don't understand how you get a markedly different characteristic by uniting the three together in a single composition. You get a markedly different characteristic when you have all three in your body at the same time. And so it could be as claimed in the same pill or it could be alternatively three different pills. You take one now, wait two minutes, take another one, wait two minutes, take another one. As long as they're all in your bloodstream at the same time, they seem to produce an effect that no one of them alone produces. We're well beyond your rebuttal. I'm sorry. Two minutes. I'm sorry. Thank you. Not your problem. We'll ask the follow-up question. May it please the court. We think here that the problem with Burgess's claims is that they bump up directly to Myriad and Funk Brothers and therefore are not patent eligible. I'd be happy to talk about each claim individually because I think there are sort of different issues for the three different claims. Why don't you start where we left off, talking about the examples and this sort of synergy when they're all taken at one time or all in the bloodstream at one time. Is it the agency's position that examples 18 and 27 represent patent eligible subject matter? We do not believe that they do. Okay. The examiner believed that they did. Okay. Let me say this. And then the board seemed to suggest that the examiner had it right. This case came out, the first office action issued early on, shortly after Myriad where there was preliminary guidance the agency had issued. The examiner sort of hints at it, says it appears that. I don't think the examiner has never had to really reach it because it thought that whatever, given the breadth of the claim that there wasn't adequate evidence of showing markedly different characteristics. It did sort of seem to hint at. But let me say this, that since that time there's been additional examples and guidance from the office and I think certainly with that guidance material we think that it wouldn't and we believe that the guidance material is consistent with what we have in Funk Brothers and in Myriad. And if I could look at the examples and this is why. Well, wait. You think, but I don't see the board. Whether you think it does now isn't really relevant, right? What's relevant is what did the board conclude and the examiner conclude and is there substantial evidence to support those findings? The board didn't rely on any office guidance and say, oh, in light of the guidance the examiner was wrong. If anything, the board seems to have endorsed the examiner. Right, and I was answering his question about, I think, whether or not there was anything at all in the example that was sufficient enough to show marked differences. The decision of the board and the examiner was based on the fact that the claims are broad. And if we look, if I can, maybe I think it would be helpful to go through the claims individually. But if I could, for example, point you to what the examiner actually found. But Judge Chen's question to you wasn't whether these claims are broad and it wasn't whether these claims are eligible. He said, is example 18 and example 27 patent eligible? That was his precise question to you. Given the examiner's finding that there are markedly different characteristics, I understand you've got a great argument for example 18 and example 27 are not even close to the breadth of these claims, right? I get that argument. Try to put that aside and just focus on the hypothetical. If there are two very specific examples in a specification, like say 1% this, 3% this, 5% this, and it is articulated that that particular combination has unexpected results, the examiner says, looks to me like it has unexpected results, the board kind of acknowledged it didn't take issue with that. If this claim were limited to that example under those circumstances, would that be eligible? Well, at this point we don't have that, and so we don't actually have a definitive determination from the examiner or the board on that. What we have, I think, fairly in the board and examiner's fact finding is that given the breadth of the claim, that there is not sufficient evidence to establish eligibility for the claim. And if I may, I mean, I would like to... I'm just interested at this point because I think we started with not withstanding what the board and the examiner held, just out there, whether or not it's at least the office's current position, whether or not that's reflected in the case or affects our decision here is another matter. But just what is your view on the examples? I think the view on the examples, and it gets to exactly what the questioning that Judge Chen was giving, is that what is shown in the examples is a comparison between, for example, in example 18, is the anthocyanins with andrographolides compared to just the anthocyanins, and they never do a comparison to the andrographolides alone. So to the extent you were questioning do we have to show more than that they do something more than they do independently, I think we don't have evidence to show that. Because we don't have anything... We're comparing A and B together, and we compare the A and B to A. We never compare A and B to B. So we don't know if it's more than additive and what they do individually just together, as opposed to something synergistic. To simplify or analogize, as I understand example 18, it says, if you drink four ounces of orange juice with four ounces of grapefruit juice, you're going to get more vitamin C than if you drink just four ounces of orange juice alone. So the question is, okay, but it doesn't explain to me if the mixture of your orange juice and grapefruit juice creates a better vitamin C effect, say, than drinking four ounces of orange juice, waiting a few minutes, and then drinking a second glass with the second glass has four ounces of grapefruit juice. Correct. And so that was my question to you, which is does the agency really believe that that example 18 is patent eligible when there's no evidence that I can see that says that drinking the mixture of orange juice and grapefruit juice yields a better healthful benefit than drinking them separately? And the agency position, I think, under our current guidance and examples, which I have in page 8 of the director's brief, I cite to where those are. You cite the link. The link. And in that link, there are two different sets of examples. There are nature-based product examples, and there are subject matter eligibility examples for life sciences, and there are examples within them that discuss the whole issue of whether you have to, that you should have more than an additive effect. So that is the agency's perspective. So just to be clear, because I want to make sure I understand this. So in Jim's example, suppose you get a 5% boost in your vitamin C level with the OJ, and you get a 5% boost. You would otherwise get a 5% boost with the four ounces of grapefruit juice. So each one individually would give you 8%. But if you drink them both, suppose the finding is your vitamin C jumps up 20%. Right. I realize this is a simple and stupid example, but suppose that were the case. That would be markedly different and unexpected, right? That is right. Okay. That's all I want to know. Perfect. Okay. There's no evidence that's this case. There is no evidence that that's this case. Even example 18 or 27, there's no evidence. And even if example 18 and 27 contain such evidence, the claims are so broadly written. It covers many, many extracts beyond what are in examples 18 and 27. It has an unlimited, almost number of percentages that these extracts would come in, and there isn't like an expert that said, oh, well, we would expect to see the same synergistic benefit across the entire range. Right. That's exactly it. And, you know, the examiner was struggling with, I think, if you look, the examiner was trying to figure out what the amounts even were in the specific example. So one of them definitely doesn't have amounts. I think it was at 27. Yeah, example, well, at page 93 of the supplemental appendix, the examiner was trying to figure out with the anthocyanin and andrographolide how much it was and figured out maybe the weight-to-weight ratio was something like 1 to 29, meaning 29 times more andrographolide, which is actually possibly outside of even the claim. But nevertheless, it said you have this, but you don't have anything to sort of cover the entire range. And that's the examiner's findings, which the board condoned. And your brief seemed to stress that there's no real structural difference at all when you mix these chemical compounds together, like the chemical compound number one, chemical compound number two, you mix them together. There's no structural difference. There's no chemical reaction that occurs between the compounds. They're just mixed together. Do you think that's necessary to establish a markedly different characteristic? I think if you have, if the two compounds don't change, I mean, the reason we stress that is that in the case of like cDNA or the case of Chakrabarty's genetically modified bacteria, there is a structural difference or something different structurally from what's in nature. But we also think that if you combine two things, and even if they are structurally the same in the combination, if they either create a new function or give more than an additive effect, that that may put you into the realm of something that's markedly different. So I guess getting back to, as Judge Moore said, my silly and stupid example, if you mix together orange juice and grapefruit juice, and instead of getting the expected extra benefit of 4% plus 4%, 8%, but you get something like 20% benefit, then even if there isn't any kind of chemical reaction going on between the mixed orange juice and grapefruit juice, whatever is going on there, somehow by simultaneously consuming both juices together, you get the extra plus benefit. That's good enough to be considered a markedly different characteristic? That would be the agency's view. I mean, we're trying to be as careful as possible to apply these without stretching them beyond what we think they reasonably say, and that is sort of the agency's position, that in those circumstances, you wouldn't necessarily have to have a change in structure of the underlying compounds as long as they actually together act synergistically. I never understood what exactly is the invention in Chakrabarti in the sense that it feels like, factually, it's similar to the facts of Funk Brothers in a way. Funk Brothers, you're mixing together all these bacteria strains, and then Chakrabarti, it's mixing together some plasmids, housing them in a bacteria? Well, they've transformed, which is something that humans had to do. They've taken plasmids' DNA, they've taken DNA, multiple different pieces of DNA, and they've transformed the bacterium. Merely just transforming is something that doesn't, the transformed bacterium doesn't occur in nature, so it's different from anything that occurs in nature. What's the transformation? Just the housing them in the bacterium? It's actually being able to take the DNA from another source and actually be able to get it incorporated into the bacterium and get the bacterium to actually utilize that DNA and express it, et cetera. The myriad opinion from the Supreme Court, it didn't actually use the two-step framework from Mayo, but it seems like the agency wants to use the two-step framework from Mayo when considering these isolated natural products and doing the patent eligibility inquiry. Do you think that's the right, is that the agency's position, that we should funnel these types of cases through the two-step Mayo Alice inquiry? I'm trying to understand what is the interplay between Chakrabarty and Myriad's markedly different characteristics inquiry versus the two-step framework set out in Mayo and Alice. Well, it is interesting that none of the nature, the natural products cases, have actually discussed the two-step process. So Myriad, Chakrabarty, they've never really gone through the two-step process. This court in Roslyn has never gone through the two-step process. The agency's guidance sort of has these in a separate box, and so it's basically taking the natural products cases and applying Myriad and Roslyn and not really going through the two-step process and sort of handling them independently. The board did kind of do the two-step process, but it seems fairly redundant because you're kind of doing the same thing in step one and step two. So I think you could fairly do it either way. But the agency has taken the position that these are kind of a separate category of things and there's case law that applies to them, and this is how the analysis is done. But at the end of the day, I think the inquiry is very similar because it's basically looking at whether or not there's something either significantly more or markedly different from the natural, whether it be an abstract idea or whatever the exception is, it's looking at and comparing to what exists in nature and whether or not there is something different from that. Do you think Claim 86 is patent eligible? The examiner did drop that, and again, this was a preliminary period where the agency was trying to figure out where to draw the line on that. The agency's position right now is probably that it might not be because they haven't actually done more than add something that is routine and conventional. But at this point, that's not in this case. If you have additional questions. We're restoring two minutes of rebuttal, if you'd like to take that. Thank you very much. We just talked about the idea of a synergy across the entire range of an ostensibly very broad claim and whether the examples support that. That could be an issue, but that would, I think, be an issue better raised under Section 103 rather than Section 101 because if we, for example, have orange juice and grapefruit juice, combine them together, if that combination is not seen anywhere in nature, that dispenses with Section 101 and product of nature right at the threshold. Then we can move on to the next question, which is does the combination of orange juice and grapefruit juice, if one gives 4% vitamin C and the other gives 3%, does the combination give an unexpected synergistic result? That is the kind of question that we would routinely raise under Section 103, not under Section 101. The combination of orange and grapefruit juice, because it's never seen in nature,  is a good question. Questions? If you don't mind, have a rest.